## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSE VALENCIA,

      **Plaintiff,**

vs.                                                    **No. 13 CV 930 JAP/WPL**

OFFICER HEINZ DE LUCA,
OFFICER SEAN STRAHON,
OFFICER CASEY SALAZAR,
OFFICER MARK LEWANDOWSKI,
OFFICER ALAN MASCARENAS,
Individually and in their official capacities
and as employees of the Santa Fe Police Department,
and the CITY OF SANTA FE,

      **Defendants.**

## MEMORANDUM ORDER AND OPINION

On December 19, 2013, Defendants, the City of Santa Fe (the City), Officers Heinz De Luca (Officer De Luca), Sean Strahon (Sergeant Strahon), Casey Salazar (Officer Salazar), Mark Lewandowski (Officer Lewandowski), and Alan Mascarenas (Officer Mascarenas) filed a motion for summary judgment. *See* DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Doc. No. 31) (Motion). The individual officers will be referred to as Defendant Officers. Defendant Officers ask the Court to grant qualified immunity and dismiss all claims brought against them by Plaintiff Jose Valencia (Plaintiff). Plaintiff opposes the Motion and claims that Officer De Luca had no reasonable basis to initiate the traffic stop of Plaintiff's vehicle, that the investigative detention was unreasonable, and that Defendant Officers used excessive force in arresting Plaintiff. *See* PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT [Doc. 31] (Doc. No. 40)

1

(Response).[1] Plaintiff contends that the evidence and the inferences drawn from the evidence, viewed in the light most favorable to him, illustrate Defendant Officers are not entitled to qualified immunity from Plaintiff's § 1983 claims.

The Court concludes that the traffic stop of Plaintiff's vehicle was reasonable. Officer De Luca's belief that Plaintiff was driving at night with only parking lights, although mistaken, was justified. The video evidence shows that Plaintiff's headlights appeared dimmer and more amber in color compared to other vehicles on the same street. Therefore, Officer De Luca acted reasonably in his stop of Plaintiff's vehicle. Once Plaintiff's vehicle was stopped, both Officer De Luca and Sergeant Strahon, who arrived at the stop to assist Officer De Luca, immediately detected an odor of burnt marijuana coming from the vehicle. Thereafter, the detention of Plaintiff and his passengers, one of whom admitted to smoking and possessing marijuana, was supported by reasonable suspicion of criminal activity. Furthermore, the evidence shows that during the investigative detention, Officer Salazar ordered Plaintiff to exit his vehicle, but Plaintiff refused, wrapped his arms around the steering wheel, and wedged his legs under the steering wheel. Officers Salazar and De Luca pulled Plaintiff out of the vehicle using physical force. However, the force used to extricate Plaintiff from his vehicle was reasonable; thus, the Defendant Officers are entitled to qualified immunity from Plaintiff's claim of excessive force. Since Plaintiff's constitutional rights were not violated during his detention and subsequent arrest, the Court will dismiss the federal §1983 claims. The Court will also dismiss the claims under the New Mexico Tort Claims Act, which depend on the existence of an illegal seizure and

---

[1] The Court also carefully considered the arguments presented in DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Doc. No. 46); PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES (Doc. No. 48); DEFENDANTS' RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES [Doc. 48] (Doc. No. 49); and REPLY TO DEFENDANTS' RESPONSE [Doc. 49] TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES (Doc. No. 50).

excessive force. Finally, since all state law claims fail, the state law vicarious liability and

negligent hiring, training, and retention claims against the City also must be dismissed.

## I.  STANDARD OF REVIEW

A.  <u>Summary Judgment and Qualified Immunity</u>

The doctrine of qualified immunity protects government officials who are required to

exercise their discretion by shielding them from liability for harm caused by reasonable exercises

of their authority. *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). When a

defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the

plaintiff to show that: (1) the defendant violated a constitutional right, and (2) the constitutional

right was clearly established at the time of defendant's conduct. *Courtney v. Okla. ex rel. Dep't

of Pub. Safety*, 722 F.3d 1216, 1222 (10th Cir. 2013). The first prong is met if the evidence,

viewed in the light most favorable to the plaintiff, shows that defendants violated the plaintiff's

constitutional rights. The second prong requires a plaintiff to show that it "would be clear to a

reasonable officer that [the officer's] conduct was unlawful in the situation he confronted."

*Courtney*, 722 F.3d at 1222. Under Supreme Court and Tenth Circuit decisions, a law is not

clearly established unless existing precedent places the right in question "beyond debate."

*Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). If a "plaintiff successfully carries his two-part

burden," then the burden shifts to the defendant, who "bears the burden, as an ordinary movant

for summary judgment, of showing no material issues of fact remain that would defeat the claim

of qualified immunity."  *Estate of Booker v. Gomez*, 745 F.3d 405, 412(10th Cir. 2014) (citations

omitted).

In this case, the Court will first determine whether Defendant Officers' actions violated

Plaintiff's constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (leaving to lower

courts the decision of which prong to decide first). A necessary component in this first step is to outline the material undisputed or indisputable facts. *Thomas v. Durasanti*, 607 F.3d 655, 659 (10th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 378 ( 2007)). In reviewing the facts, the Court must be careful not to weigh the evidence to determine the truth of the matter. *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). At this stage, the Court's central task is to "determine whether there is a genuine issue for trial." *Id.*[2]

The parties tell different versions of the events surrounding the traffic stop and detention of Plaintiff and his passengers. Defendant Officers have submitted several video recordings from their in-unit cameras, which recorded video and audio of the traffic stop. *See* Mot. Exs. A-E. This recorded evidence is significant and highly relevant in determining whether Plaintiff has met his burden of establishing a constitutional violation. *Scott,* 550 U.S. at 380-81 (reversing denial of qualified immunity because "[t]he Court of Appeals . . . should have viewed the facts in the light depicted by the videotape."). In short, the Court cannot accept either Plaintiff's or Defendants' version if "there is clear contrary video evidence of the incident at issue." *Thomas*, 607 F.3d at 659. Where there is a video recording of a particular fact at issue, the Court will rule based on the recording.

---

[2] In PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITIES (Doc. No. 48), Plaintiff cites a recent Supreme Court case, *Tolan v. Cotton*, in support of his argument that if there is a conflict in the summary judgment evidence, the Court must accept Plaintiff's version of the facts. 134 S.Ct. 1861 (May 5, 2014). However, the *Tolan* case, a § 1983 case involving a police shooting, is distinguishable from this case because there was no video recording of the incident. *Id.* at 1866-1868. The Supreme Court reversed the grant of summary judgment because, "the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" 134 S. Ct. at 1863 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986)). In *Tolan*, the lower court improperly "weighed" the evidence and improperly "resolved disputed issues in favor of the moving party." *Id.* at 1866.

B. <u>Section 1983 and the Fourth Amendment</u>

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen . . . or any other person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *City of Monterey v. Del Monte Dunes,* 526 U.S. 687, 749 n. 9 (1999) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979)).

Plaintiff alleges that Officer De Luca had no reasonable basis to initiate the traffic stop of Plaintiff's vehicle, and that the investigative detention and arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures. Ordinarily, the Fourth Amendment prohibits police officers from conducting seizures without probable cause. *United States v. Whitley*, 680 F.3d 1227, 1232 (10th Cir. 2012). However, the Supreme Court has created an exception for investigative detentions, which are brief detentions conducted for investigative purposes. *Id.* Routine traffic stops are considered investigative detentions and as such are governed by the principles set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). Under *Terry*, courts make a dual inquiry, asking first whether the detention was "justified at its inception," and second whether the detention "was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry,* 392 U.S. at 20.

Under the first step, the evidence must show that an officer's decision to stop a vehicle was "justified at its inception." *United States v. Solzano*, 158 F.3d 1107, 1111 (10th Cir. 1998). A traffic stop is valid under the Fourth Amendment if the stop was based on an observed traffic

violation or "if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995).

> A traffic stop based on an officer's incorrect but reasonable assessment of facts does not violate the Fourth Amendment. Thus, if an officer makes a traffic stop based on a mistake of fact, the only question is whether his mistake of fact is reasonable. Great deference is given to the judgment of trained law enforcement officers on the scene.

*United States v. Fowler*, 402 F. Supp. 2d 1338, 1340 (D. Utah 2005) (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1277 (11th Cir. 2003)). *See also United States v. Martin,* 411 F.3d 998, 1001 (8th Cir. 2005) ("The determinative question is not whether [defendant] actually violated the Motor Vehicle Code by operating a vehicle with one defective brake light, but whether an objectively reasonable police officer could have formed a reasonable suspicion that [defendant] was committing a code violation."). "It is enough if the court believes [the officer] made an objectively reasonable mistake in fact and so had reasonable suspicion of a traffic stop." *U.S. v. Lopez-Estrada*, No. 10-40013-02-SAC, 2010 WL 2079813, *5 (D. Kan. May 25, 2010) (unreported) (citing *United States v. Pena–Montes,* 589 F.3d 1048, 1052 (10th Cir. 2009)).

Once a police officer makes a valid traffic stop, the next inquiry is whether the stop was "reasonably related in scope" to the circumstances underlying the stop. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (quoting *Terry* 392 U.S. at 20). Since police officers are not required to "take unnecessary risks in performing their duties, they are 'authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop.' " *United States v. Perdue,* 8 F.3d 1455, 1462 (10th Cir.1993) (quoting *United States v. Hensley,* 469 U.S. 221, 235 (1985)). However, if an officer's actions exceed what is reasonably necessary under the totality of the circumstances, the prolonged stop may only be justified by probable cause or consent. *Perdue,* 8

6

F.3d at 1462. There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather a court's evaluation is by "common sense and ordinary human experience." *King,* 990 F.2d at 1562 (quoting *United States v. Montoya de Hernandez,* 473 U.S. 531, 542 (1985) (quoting *United States v. Sharpe,* 470 U.S. 675, 685 (1985))). Overall, courts must avoid "unrealistic second-guessing" of a police officer's decisions during a stop and must not require an officer to use the least intrusive means in the course of a detention, only reasonable ones. *King,* 990 F.2d at 1562–63 (quoting *Sharpe,* 470 U.S. at 686)).

If the investigative detention becomes an arrest, law enforcement officers must have probable cause to arrest under the Fourth Amendment. *Stonecipher v. Valles*, --- F.3d ---, 2014 WL 2937038, * 4 (10th Cir. July 1, 2014) (slip op.). Probable cause is not a precise quantum of evidence – it does not, for example, "require the suspect's guilt to be more likely true than false.' Instead, the relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring 'more than bare suspicion.'" *Id.* (quoting *Kerns v. Bader*, 663 F.3d  1173, 1188 (10th Cir. 2011)).

## I.  BACKGROUND

From the summary judgment evidence, particularly the video evidence, the Court finds the following facts: At approximately 10:20 pm on September 8, 2011, Officer De Luca was on routine patrol duty in his marked SFPD vehicle. Mot. Ex. H, De Luca Aff. ¶ 7. Officer De Luca was driving back and forth on Cerillos Road, a busy multi-lane street in Santa Fe, New Mexico. De Luca Aff. ¶ 7; Mot. Ex. A, De Luca In-Unit Video 00:01-1:07. After driving northeast for several blocks, Officer De Luca turned his patrol vehicle around and began driving southwest on Cerillos Road. De Luca Video 1:07. Shortly after turning around, Officer De Luca observed a 2003 white Chevrolet Impala (the Impala) driving in the opposite direction on Cerillos Road. *Id.*

¶ 7; De Luca Video 1:20-1:27. The Impala's front lights appeared dimmer and "dull orange in color" compared with the bright white headlights of the other vehicles on the road. De Luca Aff. ¶ 7; De Luca Video 1:20-1:27. Based on this observation, De Luca believed that the Impala was operating with only its parking lights, which is a violation of the Santa Fe Traffic Code. De Luca Aff ¶ 8; Santa Fe City Code § 12-10-1.5(D).[3] Officer De Luca made a U-turn and switched on his emergency lights. De Luca Video 1:27-1:49.  As Officer De Luca approached the Impala from behind, the vehicle signaled a left turn, pulled into the left turn lane, and stopped at a red light. De Luca Aff. ¶ 8; De Luca Video 1:49-1:58.  Before the light turned green, the Impala began a left turn across the intersection. De Luca Aff. ¶ 8; De Luca Video 2:01-2:08.[4] The Impala then immediately turned right into a corner gasoline station and came to a stop.  De Luca Aff. ¶ 8; De Luca Video 2:19-2:31.

While the Impala and Officer De Luca were waiting at the red light, SFPD Sergeant Sean Strahon, also on routine patrol, pulled his patrol unit behind Offer De Luca's patrol unit to assist with the traffic stop.[5] De Luca Aff. ¶ 10; Strahon Aff. ¶¶ 5-6; Mot. Ex. B, Strahon In-Unit Video 1:31-2:18.  As the Impala made its left turn onto the side street and then its right turn into the gasoline station, both Officer De Luca's video and Sergeant Strahon's video show that the

---

[3] The Santa Fe Ordinance reads,

> Every vehicle upon a street within this municipality at any time from a half-hour after sunset to a half-hour before sunrise and at any other time when there is not sufficient light to render clearly discernible persons and vehicles on the street at a distance of five hundred feet ahead shall display lighted lamps and illuminating devices as hereinafter respectively required for different classes of vehicles, subject to exceptions with respect to parked vehicles as hereinafter stated. (66-3-802 NMSA 1978).
> . . .
> For the purposes of Sections 12-10-1.1 through 12-10-1.5 parking lamps shall not be used in lieu of head lamps.

Resp. Ex. F (Santa Fe City Code §§ 12-10-1.3, 12-10-1.5 (D)).

[4] Although Officer De Luca testified that this action caused him to suspect the driver may have been impaired, Officer De Luca had already turned on his emergency lights. Therefore, the red light infraction will not figure into the Court's determination of reasonable cause to initiate a *Terry* stop. Only Plaintiff's alleged headlight infraction can be considered in this determination. However, the ensuing investigation into whether Plaintiff was driving while intoxicated necessarily can rely on all the officers' observations of Plaintiff's driving and behavior.

[5] It is SFPD's common practice that, if a second officer is available in the area, that officer will assist with a traffic stop initiated after dark. De Luca Aff. ¶ 10; Strahon Aff. ¶ 5.

Impala's headlights did not illuminate the street or other objects in front of it as brightly as other vehicles depicted in the videos. De Luca Aff. ¶ 9; De Luca Video 2:03-2:20; Strahon Video 1:46.[6]

     After the Impala and the two police vehicles came to a stop, Officer De Luca approached the passenger side of the Impala, and Sergeant Strahon approached the driver's side. De Luca Aff. ¶ 11; De Luca Video 2:57; Strahon Aff. ¶ 7; Strahon Video 2:30.[7] When the driver's window was opened, Sergeant Strahon immediately noticed a strong odor of "recently smoked marijuana" inside the vehicle. Strahon Aff. ¶ 7. Officer De Luca also detected "the strong odor of marijuana in the car." De Luca Aff. ¶ 11. The video evidence shows that when the driver's side window was opened, Sergeant Strahon immediately asked Plaintiff if they had smoked "weed." Strahon Video 2:51. Sergeant Strahon also waved his hand back and forth in front of his face in response to the odor. *See* De Luca Video 3:39-3:42; Strahon Video 3:02-3:04. In his affidavit, Plaintiff claims that no marijuana smoke emanated from the vehicle and that he did not "ingest[] intoxicating substances and . . . was not impaired.". Plaintiff's Aff. ¶¶ 6, 22. However, neither of these statements, nor any other evidence, directly refutes the affidavit testimony submitted by Defendants that when the windows were opened, Sergeant Strahon and Officer De Luca could smell burnt marijuana inside the Impala. Although the video evidence cannot directly support these officers' affidavit testimony that they smelled marijuana, Plaintiff has failed to present evidence directly refuting the officers' affidavit testimony, and the video evidence concerning the officers' questions about marijuana somewhat corroborates the affidavit testimony.  Hence,

---

[6] The video depictions of other vehicles that Officer De Luca drove past on Cerillos Road clearly illustrate that the Plaintiff's vehicle did not illuminate objects in front of it. Compare the vehicle depicted on De Luca Video at 1:01 with view of Plaintiff's vehicle depicted on De Luca Video at 2:03-2:18.

[7] It is undisputed that Officer De Luca was fairly new to his job on the night in question.  De Luca Aff. ¶ 2 ("I was hired by the SFPD in July 2010"). It is apparent from the video recordings that Sergeant Strahon was in a supervisory roll and directed some of Officer De Luca's actions during this detention.

the Court is justified in finding as an undisputed fact, that Sergeant Strahon and Officer De Luca reasonably believed that they smelled burnt marijuana inside the Impala when the windows were opened.

At this point, Sergeant Strahon and Officer De Luca began investigating whether Plaintiff and his passengers were in possession of marijuana.[8] The passengers were later identified to be Cameran Tallman and James Montano. All three of the Impala's occupants were juveniles from Pecos, New Mexico. During the first thirteen minutes of the stop, neither officer told Plaintiff the reason for the traffic stop. De Luca Video 15:05 (telling driver the reason for the stop).

Officer De Luca asked Plaintiff for his driver's license, vehicle registration, and proof of insurance, and Plaintiff complied. De Luca Aff. ¶ 11. Sergeant Strahon told the vehicle's occupants that he could smell burnt marijuana coming from the Impala and advised the vehicle's occupants to hand over any existing marijuana or drug paraphernalia to make things easier. Strahon Aff. ¶ 7; Strahon Video 2:51-3:27. The front passenger, Cameran Tallman, handed Officer De Luca a partially smoked marijuana cigarette, called a "roach" and told Officer De Luca they had smoked the cigarette that evening.  De Luca Aff. ¶ 12; De Luca Video 5:20-5:26. Officer De Luca showed the "roach" to Sergeant Strahon. Strahon Video 5:49. In response to Sergeant Strahon's question "have you been smoking weed," someone inside the vehicle told Sergeant Strahon that they had smoked "spice." Strahon Video 4:20. Plaintiff handed Sergeant Strahon a bag containing a substance labeled "Cush," and the officers suspected this substance was illegal synthetic cannabis. De Luca Aff. ¶¶ 12-13; Strahon Aff. ¶¶ 7-8; De Luca Video 3:30-

---

[8] In New Mexico, a person found guilty of a first offense of possession of less than one ounce of marijuana or synthetic cannabinoids is guilty of a misdemeanor punishable by a fine of not less than $50.00 and by imprisonment for not more than 15 days. NMSA 1978 § 30-31-23 (A), (B) (1).

5:43; Strahon Video 3:22-5:18.[9] Sergeant Strahon looked at the bag and read the label, "not for human consumption," and Sergeant Strahon remarked that the substance was labeled "potpourri." Strahon Video 4:25-4:30.

In his affidavit, Plaintiff testifies he "did not admit to smoking anything to the officers." Plaintiff's Aff. ¶ 22. Plaintiff also denies that he gave a "container or a bag of 'spice' or 'synthetic marijuana,'" to Sergeant Strahon or to "anyone else." Plaintiff's Aff. ¶ 24. In the Strahon Video, someone inside the vehicle can be heard saying that they had been smoking "spice." Strahon Video 4:20. The undisputed affidavit testimony from Officer De Luca and Sergeant Strahon supports Defendants' assertion that they smelled marijuana.  The video evidence established that one of the passengers admitted they had smoked marijuana, and that one of the passengers handed Officer De Luca a "roach." In ruling on the summary judgment motion, however, the Court will not consider the officers' testimony that Plaintiff said they had smoked spice and that Plaintiff handed Sergeant Strahon a bag labeled as "potpourri." Nevertheless, the evidence shows Sergeant Strahon and Officer De Luca had sufficient reasonable suspicion to continue the detention beyond the traffic or equipment violation investigation and thereby determine whether the Impala's occupants were in possession of marijuana or synthetic cannabinoids, recently made illegal,[10] and whether the Plaintiff had been driving while impaired.

Officer De Luca asked for the identification cards, names, and dates of birth of the two passengers and returned to his police vehicle to write a citation and to "run" the information through dispatch. De Luca Aff. ¶ 13. Officer De Luca "contacted the Santa Fe Regional

---

[9] Both officers stated that it was Plaintiff who told them they had smoked spice.  However, the video evidence does not indicate clearly who told the officers they had been smoking spice. The video does depict Plaintiff, the driver, handing a bag of something to Sergeant Strahon.
[10] See NMSA 1978 § 30-31-23 (effective March 31, 2011).

Emergency Communication Center and provided them with Cameran's and James' information.

The Santa Fe Regional Emergency Communication Center provided [Officer De Luca] with

returned information on Cameran. However, [Officer De Luca] learned that James' information

was not on file." Resp. Ex. B, De Luca Narrative Report, Case No. #11-013698, (Sept. 8, 2011);

De Luca Video 7:00-7:41; De Luca Aff. ¶¶ 9-10; Strahon Video 5:30-7-18. Officer De Luca ran

the passengers' information through the National Crime Information Center (NCIC) database,

but "[t]he information that Mr. Montano provided [to Officer De Luca] did not come back on file

through the NCIC database." *Id.* [11]

While waiting for Officer De Luca to write the traffic citation, Plaintiff, still sitting in the

driver's seat, told Sergeant Strahon that he was cold and asked for his jacket from the back seat.

Strahon Video 12:27-12:47. For safety purposes, Sergeant Strahon asked Plaintiff to hand him

the jacket so he could pat down the jacket for weapons. *Id.* No weapons were found in the jacket,

and Sergeant Strahon handed it to Plaintiff. Strahon Aff. ¶ 10; Strahon Video 12:29-12:34.

After writing the citation for driving without headlights, Officer De Luca walked to the

driver's side of the vehicle, informed Plaintiff about the citation and returned Plaintiff's driver's

license, registration, and proof of insurance.[12] De Luca Video 15:07-16:25; Strahon Video 14:32-

15:00. Mentioning the smell of marijuana, De Luca then asked Plaintiff to allow him to search

the vehicle for marijuana or drug paraphernalia. De Luca Aff. ¶ 15; De Luca Video 15:05.

Plaintiff refused the request, informing Officer De Luca that he had just phoned his father and

his father had advised Plaintiff not to do anything until he arrived. De Luca Aff. ¶ 15; Strahon

---

[11] The NCIC database lists information regarding past criminal arrests and convictions as well as reports of missing children. Plaintiff maintains that none of the occupants of the vehicle had criminal records, thus, no information would have been available as to them in the NCIC database. Resp. Ex. 5.

[12] In reality, the vehicle's headlights were on.  The 2003 Impala is equipped with an "auto headlight" feature that illuminates the headlights with a dusk sensor. Affidavit of James Finnegan, Response Ex. C; Plaintiff's Aff. ¶¶ 15-17 (Resp. Ex. D.)

Aff. ¶ 12; De Luca Video 15:05-17:51. Officer De Luca then approached the passenger side of the vehicle to get additional personal information from Mr. Montano, in order to identify him. De Luca Aff. ¶ 16. Mr. Montano would not provide his address or social security number. Upon learning this Sergeant Strahon suspected Mr. Montano might be concealing his identity. De Luca Aff. ¶¶ 16-17; De Luca Video 21:21- 24:13; Strahon Video 5:20-5:35 and 20:46-26:05. In the Strahon Video, (26:00-26:05) Mr. Montano is heard explaining to Officer De Luca hat he just moved and he did not know his new address.

While Officer De Luca was talking to Mr. Montano, Officer Salazar arrived. Strahon Video 21:41; Mot. Ex. C, Casey Salazar In-Unit Video 00:52-1:07. Sergeant Strahon had requested an additional officer because he and Officer De Luca were outnumbered by the Impala's three occupants. De Luca Aff. ¶ 17; Strahon Aff. ¶¶ 11, 13; Salazar Aff. ¶¶ 4-5. Officer Salazar approached the driver's side, asked several times for the keys, which Plaintiff eventually gave him, and Officer Salazar placed the keys on top of the Impala. Salazar Video 2:50-3:27; Strahon  Video 23:20-23:53.

Approximately one to two minutes after the Impala's engine was turned off and the keys were removed from the ignition, Sergeant Strahon asked the passenger, James Montano, to step out of the vehicle because he believed the passenger was concealing his identity. De Luca Video 25:41; Strahon Aff. ¶ 14; Strahon Video 24:55-25:05. Sergeant Strahon tried to open the back passenger door, but it was locked. De Luca Video 25:42; Strahon Video 24:55. Sergeant Strahon told Plaintiff "I need him [Montano] out of the car." Strahon Video 25:20-25:23. Plaintiff told his passenger not to exit the vehicle and argued that Sergeant Strahon could not order his passengers to exit the vehicle without a warrant. Strahon Video 25:06-25:36. Sergeant Strahon

13

informed Plaintiff that he did not need a warrant to order Mr. Montano to exit the vehicle. *Id.*
Sergeant Strahon asked Plaintiff to unlock the rear passenger door. *Id.*[13]

In his Response, Plaintiff contends that he "did not lock the doors of the vehicle" and
points to the video "when Casey Salazar simply opens the **driver's side door** using the exterior
latch. (*See* Deluca's (sic) in-unit video at 26:07)[.]" Plaintiff's Aff. ¶ 28 (emphasis added).
However, the unlocked driver's door does not prove that the back passenger door was unlocked.
Plaintiff further testifies, ". . . the officers could have used the keys in Salazar's possession to
open a locked door at any time. James simply gets out of the car before any of the officers move
to unlock any doors. (*See* Salazar's in-unit video at 5:14)" *Id.* This last sentence is incomplete.
Officer De Luca's Video shows that Sergeant Strahon was unable to open the back passenger
door when he first tries the latch. Strahon Video 24:55. However, whether Plaintiff locked Mr.
Montano's door is disputed and will not factor into the Court's decision.

Defendant Officers assert that when Sergeant Strahon told Plaintiff that Mr. Montano
must step out of the car, Plaintiff began rolling up the back passenger's window, which the
Sergeant Strahon interpreted as Plaintiff's attempt to obstruct their investigation.  De Luca Aff. ¶
18; Strahon Aff. ¶ 7; De Luca Video 25:28-26:06; Strahon Video 25:05-25:30. In his affidavit,
Plaintiff testified that he did not roll the windows up because, "with the keys removed from the
ignition, it would be impossible for me to either roll up the windows of the vehicle up or down. .
. ." Plaintiff's Aff. ¶ 28. "The driver's side window remained open the entire time. I did not 'roll
up' any windows. I couldn't have without the ignition on. The keys to the car had been
surrendered to Salazar." Plaintiff's Aff. ¶ 29 (citing Salazar's Video 2:53). In the Reply,

---

[13] In his affidavit, Plaintiff testifies, "I did not attempt to prevent or take any action that would prevent the
passengers of my vehicle from exiting the vehicle. Any of us could have exited the vehicle at any time by simply
opening the door."  Plaintiff's Aff. ¶ 8. Since the video records Sergeant Strahon trying unsuccessfully to open the
back passenger's door and asking Plaintiff to unlock the rear passenger door, the door was clearly locked, but at this
stage the Court cannot conclude it was Plaintiff who locked the door to block Mr. Montano's exit from the Impala.

Defendants attach a copy of the owner's manual of a 2003 Impala. Reply Ex. A. The manual states that the 2003 Impala has "Retained Accessory Power (RAP)," which allows the Impala to operate power windows, audio system, and sunroof "for up to 10 minutes after the ignition is turned to OFF and none of the doors is opened." *Id.* Therefore, a reasonable inference can be made that someone in the vehicle could have "rolled up" the back passenger window at the time Sergeant Strahon asked the rear passenger to exit the vehicle, which occurred within 10 minutes after Plaintiff shut off the ignition and handed the keys to Officer Salazar. Salazar Video 2:50; Strahon Video 25:05. The Court can find that on this evidence it was reasonable for Sergeant Strahon to suspect it was Plaintiff who rolled up the back passenger's window, leading to Sergeant Strahon's reasonable suspicion that Plaintiff attempted to obstruct the investigation. The Court may also find, as Defendants assert, that Sergeant Strahon reasonably believed Plaintiff's actions could constitute false imprisonment. Strahon Aff. ¶ 15. Moreover, the Court will find that Plaintiff's argumentative reaction to Sergeant Strahon's request that Mr. Montano exit the vehicle could have reasonably led the Defendant Officers to believe their safety was at risk. De Luca Aff. ¶ 19; Strahon Aff. ¶ 16; Salazar Aff. ¶ 8. As discussed *infra*, as a general rule, law enforcement officers are justified during a legal traffic stop to have all occupants step out of the vehicle for safety purposes.

During the time Plaintiff was arguing that the Defendant Officers had no right to order Mr. Montano to exit the Impala, Sergeant Strahon instructed Officer De Luca and Officer Salazar to remove Plaintiff from the vehicle. De Luca Video 26:06 (Strahon to Officers De Luca and Salazar, "you need to take him out"). Officer Salazar opened the driver's side door and asked Plaintiff to get out of the vehicle multiple times. Salazar Aff. ¶ 8; De Luca Video 26:06-08; Strahon Video 25:33; Salazar Video 5:05-5:30 (audio only). Plaintiff refused, grabbed the

steering wheel, braced his legs against the floorboard, and continued to loudly argue with Officers De Luca and Salazar. De Luca Aff. ¶¶ 20-21; Strahon Aff. ¶ 17, 19-20; Salazar Aff. ¶¶ 8-9; De Luca Video 26:06-28:13; Strahon Video 25:34-27:36; Salazar Video 5:05-7:15 (audio only).  For approximately two minutes, Officers De Luca and Salazar struggled to pull Plaintiff by the arms out of the vehicle while repeatedly ordering Plaintiff to step out of the car. *Id.* Eventually, Officer De Luca was able to use pressure points and leverage techniques on Plaintiff's wrist to get Plaintiff to let go of the steering wheel and then both Officers De Luca and Salazar pulled Plaintiff out of the vehicle. *Id.* Toward the end of the struggle, Sergeant Strahon came around to the driver's side and told Plaintiff he was obstructing officers by refusing to step out of the car. Strahon Video 27:10-27:18. These three Defendant Officers testified that because Plaintiff was a juvenile, they did not strike Plaintiff and did not use pepper spray, a Taser, or a baton. De Luca Aff. ¶ 21; Strahon Aff. ¶ 20; Salazar Aff. ¶ 9.

Plaintiff maintains that he resisted removal because his seatbelt was on, and the officers did not let him unlatch his seatbelt. Plaintiff's Aff. ¶ 14. However, when the Officer Salazar asked Plaintiff to step out of the vehicle several times, prior to either officer laying hands on Plaintiff, Plaintiff did not mention his seatbelt. De Luca Video 26:06-26:08. Also, during the entire two minute struggle, Plaintiff never told the officers that his seatbelt was latched. The Court will disregard Plaintiff's self-serving affidavit testimony that he refused to exit the vehicle because he was "belted into the car" and that "[the officers] were preventing" Plaintiff from exiting the vehicle. Plaintiff's Aff. ¶ 14. But, even if Plaintiff had his seatbelt on, he had no right to refuse a lawful order to exit the vehicle and remain in his vehicle.

After pulling Plaintiff out of the Impala, Officer Salazar placed Plaintiff in handcuffs, and advised him that he was under arrest for resisting and obstructing an officer. Officer De Luca

patted Plaintiff down for weapons. De Luca Video 28:25-29:40; Strahon Video 27:39-27:46. Plaintiff continued loudly arguing with the officers. *Id.* At this time, Officers Lewandowski and Mascarenas arrived on the scene. De Luca Video 29:32; Strahon Video 28:29; Salazar Video 8:20; Mot. Ex. D, Lewandowski In-Unit Video 00:01-1:25.

During the pat down of Plaintiff, Officer De Luca removed a clear plastic bag from Plaintiff's jacket pocket and let it fall to the ground. Lewandowski Video 2:12. Sergeant Strahon immediately picked up the bag and handed it to Officer De Luca. De Luca Video 29:44; Strahon Video 29:00-29:07; Lewandowski Video 2:16-2:20. A few minutes later, Officer De Luca field tested the substance in the bag, and the substance tested positive for marijuana. De Luca Aff. ¶ 22; Strahon Aff. ¶ 21; Salazar Aff. ¶ 10; De Luca Video 29:13-30:01; Strahon Video 27:36-29:26; Salazar Video 7:15-9:00. Officer Lewandowski read Plaintiff his Miranda rights as he walked Plaintiff to Officer De Luca's patrol vehicle. Salazar Video 7:42-7:45; 8:59-9:20; Lewandowski Video 2:40-3:20. Plaintiff was placed in Officer De Luca's patrol vehicle, and waited there until his father arrived some time later. De Luca Video 30:00-30:11; Mot. Ex. E, Officer De Luca's Second In-Unit Video Camera located inside Officer De Luca's police vehicle 23:00-24:10.

After placing Plaintiff into Officer De Luca's vehicle, Officer Lewandowski approached Mr. Tallman, who was still sitting in the front seat of the Impala and asked him if he was "on any other drugs." Mr. Tallman answered "no." Strahon Video 29:50-29:55. Officer Lewandowski instructed Mr. Tallman that he needed to call a parent or a legal guardian to come pick him up. Strahon Video 31:10-31:15; Lewandowski Video 5:00-5:56. Mr. Tallman spoke to his mother on his cell phone, and during the call, Officer Lewandowski asked to talk to Mr. Tallman's mother. Officer Lewandowski instructed Mr. Tallman's mother that she could pick up her son at a nearby

police station and gave her directions to the station. Lewandowski Video 7:08-9:28. Officer Lewandowski asked Mr. Tallman to exit the Impala, and Mr. Tallman complied. Lewandowski Video 9:40. Mr. Tallman was read his Miranda rights, patted down, but not handcuffed, and placed in the back seat of Officer Lewandowski's police vehicle. Lewandowski Video 9:48-11:57.

After advising Mr. Tallman of his Miranda rights a second time, Officer De Luca questioned Mr. Tallman for a short time while Mr. Tallman was sitting in the back of Officer Lewandowski's police vehicle. Lewandowski Video 12:44-17:59.  Mr. Tallman told Officer De Luca that the three had gone to the Zozobra festival and made the stupid choice of smoking pot "in the car." Lewandowski Video 15:30-16:00. When asked how much they had smoked, Mr. Tallman said they had smoked a "pretty big joint." Lewandowski Video 15:50-15:58. Officer Lewandowski then transported Mr. Tallman to the SFPD station. Lewandowski Video 28:00-33:11.

Because the Impala was to be impounded, Officer Salazar and Officer Lewandowski did an inventory search of the Impala. Salazar Aff. ¶ 11; Lewandowski Aff. ¶ 9; Salazar Video 23:35-31:11. During the search, Officer Lewandowski discovered "a small plastic vial between the center console and driver seat marked 'cush' with a leafy green substance within." Lewandowski Aff. ¶ 9; Salazar Narrative Report at 2; Salazar Aff. ¶ 11; Salazar Video 24:30-45. Officer Lewandowski "gave the substance to Officer De Luca who informed Officer Lewandowski that he would test the substance . . . as well as the substance he found located in a plastic baggy in Mr. Valencia, Jr.'s pocket." Lewandowski Aff. ¶ 9; Salazar Narrative Report at 2; Salazar Video 24:51-24:56.

After the inventory search of the Impala, Plaintiff's father arrived at the scene and talked to Officer Salazar, who detailed the evening's events, particularly Plaintiff's resistance to the order to exit the Impala. Salazar Video 35:05-36:50. Plaintiff's father informed Officer Salazar that Plaintiff had Type I diabetes and that Plaintiff acted erratically when his blood sugar was low. Salazar Video 36:50-36:56; 40:40-40:48. Plaintiff's father was offered, but declined, medical treatment for Plaintiff. Salazar Aff. ¶ 12; Salazar Video 34:44-50:10. Plaintiff's father allowed one of the Defendant Officers to photograph Plaintiff for signs of injuries. Salazar Video 56:00-56:20; 58:43-1:0-1:03. Plaintiff was released to the custody of his father, and at the father's request, the Impala was unhooked from a tow truck. Plaintiff's father then drove the Impala away with Plaintiff in the passenger's seat. Salazar 38:-39:25; 1:07:40. Plaintiff's traffic citation was dismissed by the municipal court. Plaintiff's Aff. ¶ 47. The charges against Plaintiff of possession of drugs and resisting and obstructing a police officer were also dismissed. *Id.*

On September 5, 2013, Plaintiff filed a COMPLAINT (Doc. No. 1-2) in the First Judicial District Court, Santa Fe County, New Mexico. Plaintiff asked for an award of damages for injuries, including Post Traumatic Stress Disorder, he claims resulted from the encounter. Plaintiff's Aff. ¶ 48. Count I of the Complaint asserts a claim under 42 U.S.C. § 1983 for unlawful detention and seizure against all Defendant Officers. Count II asserts a § 1983 claim that Defendant Officers used excessive force during the arrest. Count III asserts a § 1983 claim that Defendant Officers violated Plaintiff's First Amendment right to free speech alleging that Defendant Officers unlawfully seized Plaintiff in retaliation for Plaintiff's expression of his right not to be ordered to exit his vehicle. In Count IV, Plaintiff asserts claims under state law for assault, battery, false arrest, and false imprisonment against the Defendant Officers. In Count V, Plaintiff alleges that Defendant Officers violated the New Mexico Children's Code by illegally

detaining Plaintiff, a juvenile. Count VI is a state law claim of malicious prosecution against

Officer De Luca. Count VII alleges that the City is liable for negligent hiring, training, and

retention of Defendant Officers. Count VIII asserts that the City is liable for Defendant Officers'

illegal actions under the doctrine of respondeat superior.  On September 25, 2013, Defendants

removed the case to this Court.

## II. DISCUSSION

### A.  Additional Discovery under Rule 56(d) Is Not Warranted

Under Rule 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified

reasons, it cannot present facts essential to justify its opposition [to summary judgment], the

court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or

declarations or to take discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).

To get relief under Rule 56(d), the party or his counsel must file an affidavit explaining why

facts necessary to rebut the motion for summary judgment cannot be presented. *Valley Forge Ins.*

*Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2012). The affidavit

must identify the unavailable facts, why the facts cannot be presented, the steps taken to obtain

them, and how additional time will help the party obtain the facts and rebut the motion for

summary judgment. *Id.*

In his Response, Plaintiff asks the Court to defer ruling on the Motion under Rule 56(d)

and allow his counsel to perform additional discovery, which Plaintiff contends is necessary for

Plaintiff to adequately respond to Defendants' Motion. In support of his request, Plaintiff

incorporates his counsel's affidavit attached as Exhibit A to PLAINTIFF'S RESPONSE TO

DEFENDANTS' MOTION TO STAY [Doc. 33] (Doc. No. 39). In the affidavit, Plaintiff's

counsel, Frances Crockett Carpenter, states that she needs to depose all of the Defendant Officers

as well as Cameran Tallman and James Montano to counter the "statements made by the officers which are not supported by the video" because the "audio portion of the video is very difficult to hear and only ascertainable at certain periods." Resp. Mot. Stay Ex. A, Carpenter Aff. ¶ 2. According to Plaintiff, Defendants are relying on statements made by the Plaintiff and his passengers that are "not audible on the videos submitted by Defendants." *Id.* Thus, Plaintiff "should be able to depose Defendants as to what was exactly said." *Id.*

The Court has carefully reviewed the videos presented by Defendants and in ruling on the Motion, the Court has not relied on any of the inaudible portions of the videos. For example, Defendants point to a recorded conversation between Sergeant Strahon and Plaintiff at the beginning of the traffic stop in which Defendants claim that Plaintiff told Sergeant Strahon that they had been smoking "spice." This exchange is barely audible, and it is not clear which of the Impala's occupants made the statement. In the recording, it can be discerned only that someone inside the Impala said they had smoked "spice." *See* Strahon Video 3:31-3:35. This conversation was not material to the Court's decision on summary judgment. Therefore, further discovery into these statements would not aid Plaintiff's opposition to the Motion. Significantly, the video evidence and affidavit testimony establishes that both Sergeant Strahon and Officer De Luca immediately detected a strong odor of burnt marijuana inside the Impala, that Mr. Tallman immediately admitted they had smoked pot in the car, and that Mr. Tallman relinquished a partially smoked marijuana cigarette to Officer De Luca. This evidence supports a finding that the Sergeant Strahon and Officer De Luca had sufficient reasonable and articulable suspicion to investigate whether one or more of the Impala's occupants possessed narcotics and whether the driver was intoxicated. *See United States v. Corral*, 823 F.2d 1389, 1393 (10th Cir. 1987) (holding that officers had reasonable and articulable suspicion that the individuals might be

involved in violation of the narcotics laws when they recognized the odor of marijuana as soon as the driver rolled down the window). The Court need not find the Plaintiff made the statement about spice because there is ample support for the investigative detention in the discernible audio portions of the video recordings.

Next, Plaintiff's counsel submits Plaintiff must "depose Officer De Luca, who was driving the same make and model car as Plaintiff—Chevrolet Impala—as to how parking lights are different than headlights on this particular vehicle." Carpenter Aff. ¶ 2. This argument seems to infer that Officer De Luca should have known that the Impala he was pulling over had its headlights on because the Impala has a dusk sensor that automatically turns on the headlights. Plaintiff seems to be asking the Court to allow further discovery into whether Officer De Luca could have reasonably believed the Impala was driving with only parking lights illuminated. However, this type of discovery would yield at most facts that are immaterial to the Court's ruling on the Motion.

When the Impala first comes into view on Officer De Luca's video, the Impala's front lights appear dull amber in comparison with the bright white lights of other vehicles. Plaintiff fails to explain how Officer De Luca would have known at that moment he was looking at an Impala. It was his initial observation of the Impala's lights that led Officer De Luca to engage his emergency lights, turn around, and pull over Plaintiff's vehicle. Further, even if Officer De Luca knew he was looking at an Impala, which he would have known only when he pulled up behind Plaintiff's vehicle at the stop light, Officer De Luca could reasonably have thought that Plaintiff's Impala had non-functioning headlights and functioning parking lights. Hence, a deposition of Officer De Luca regarding the difference between the parking lights and the headlights of a 2003 Impala would not help Plaintiff's argument against summary judgment.

The crux of Rule 56(d) is that "summary judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is *essential* to his opposition." *Hackworth v. Progressive Casualty Ins. Co.*, 468 F.3d 722, 732 (10th Cir. 2006) (emphasis added).  Information from Officer De Luca about his thought process leading up to the stop is not essential to Plaintiff's opposition to summary judgment because the video evidence supports Officer De Luca's reasonable, though mistaken, suspicion that he was pulling over a car using only parking lights in violation of the Santa Fe City Code. Moreover, the standard applied here is whether a reasonable officer could have believed that the Impala was being driven with only its parking lights engaged based on the evidence available to Officer De Luca, namely his visual observations recorded in De Luca's Video. *See Vercher*, 358 F.3d 1257, 1261, 1263 (10th Cir. 2004).

Finally, Plaintiff's counsel claims she needs to depose Officer De Luca about the reason he "called for backup before he even made the traffic stop and despite the fact that his sergeant had immediately pulled in behind him before he made the call for backup." Carpenter Aff. ¶ 2. This fact is not supported by the video evidence, but even if it were true, it is undisputed that SFPD had a policy requiring an additional officer to assist during all nighttime traffic stops. Strahon Aff. ¶ 5. This policy is reasonable given the inherent dangers presented by a nighttime traffic stop. *See United States v. Lee*, 458 Fed. Appx. 741, 722 (10th Cir. Jan. 31, 2012) (unpublished) (citing *Maryland v. Wilson,* 519 U.S. 408, 413 (1997) (noting inherent danger of all traffic stops in this day and age and the increased danger when an officer stops a vehicle with more than one occupant). Thus, even if Officer De Luca called for backup, as the Plaintiff maintains, this fact does not support Plaintiff's position.

B.  <u>The Material Facts Are Supported By Admissible Evidence</u>

Plaintiff next argues that much of the evidence supporting summary judgment is hearsay

evidence that the Court cannot use on summary judgment. *Miller v. Dillard's, Inc.*, 166 F. Supp.

2d 1326, 1331-32 (D. Kan. 2001) (stating "[e]vidence premised on inadmissible hearsay 'is not

suitable grist for the summary judgment mill.'"). Plaintiff is correct; the Court cannot consider

any of Defendant Officers' hearsay statements offered in support of their motion for summary

judgment. Specifically, Plaintiff asks the Court to disregard Defendants' statement of undisputed

facts nos. 9, 13, 15, 16, 22, and 23. However, not all of the facts in these sections are based on

inadmissible hearsay.

In fact number 9, Defendants assert that "the front seat passenger handed Officer De

Luca the remainder of a marijuana cigarette (a 'roach') and informed Officer De Luca that the

roach was all that was left from a joint that the vehicle occupants had smoked earlier." Mot. at 7

(citing De Luca Aff. ¶¶ 12-13). If this were the only evidence regarding what the front seat

passenger said, the evidence would be inadmissible. However, the passenger's statement about

the "roach" is audible on Officer De Luca's Video. *See* De Luca Video 5:20-5:26. Therefore, the

video recording is direct evidence of what Mr. Tallman told Officer De Luca. Even if this

evidence is not considered, the smell of burnt marijuana alone was sufficient for Sergeant

Strahon and Officer De Luca to detain Plaintiff and the passengers to investigate marijuana

possession.  *See Corral*, 823 F.2d at 1393 (holding that officers had reasonable and articulable

suspicion based on the odor of marijuana emanating from the vehicle).

Fact number 13 avers that the back seat passenger, James Montano, "could not provide

his address and social security number." Although not clearly audible, Officer De Luca can be

heard to say to Sergeant Strahon that "he cannot give me his address or social security number."

24

De Luca Video 25:30. Upon learning that, Sergeant Strahon ordered the passenger out of the vehicle. What Plaintiff fails to recognize is that even if Mr. Montano's failure to provide his address and social security number is disregarded, the Defendant Officers had the right to order all occupants out of the vehicle. *See Maryland v. Wilson*, 519 U.S. at 414-15 (holding that an officer may order passengers to get out of the car pending completion of the stop); *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007) (holding that officers have wide discretion during traffic stop to ensure their own safety including "running a background check and removing the occupants from the vehicle."). Therefore, the disputed fact regarding whether Mr. Montano knew his address and social security number is not fatal to the Defendant Officers' qualified immunity defense because Sergeant Strahon  properly ordered Mr. Montano to get out of the Impala.

Fact 15, stating that Plaintiff "instructed his passenger not to get out and began to argue with the officers," is not considered hearsay and is admissible. *See* Fed. R. Evid. 801(d)(2) (providing that an opposing party's statement is not hearsay). Thus, all statements made by Plaintiff that are recounted in affidavit testimony are not hearsay.

Fact 16 says, "[t]he rear passenger indicated that he wanted to get out of the vehicle, but he appeared unable to do so at that point, . . ." If the passenger "indicated" through spoken word that he wanted to exit the vehicle, then the statement would be hearsay and inadmissible. Again, the statement is not material to the Court's decision. Plaintiff's argumentative statements, which are not hearsay under Rule 801(d)(2), are sufficient to support a reasonable  belief that Plaintiff was attempting to obstruct the investigation.

Fact 22 provides "[d]uring an interview with the front seat passenger Cameran Tallman, after being advised of his rights, Mr. Tallman told Officer De Luca that they had gone to the Zozobra festival and made the stupid choice to smoke 'pot' in the car. When asked how much

they had smoked, Mr. Tallman characterized it as 'a pretty big joint.'" Although Mr. Tallman's statements would be hearsay if recounted only in a Defendant Officer's affidavit, Mr. Tallman's statements are clearly audible on Officer Lewandowski's Video. Hence, the statements are supported by direct evidence. *See generally,* Lewandowski Video 12:44-17:59.

Finally, Fact 23 states that Plaintiff's father "arrived on the scene and discussed the situation with Officer Salazar. Officer Salazar detailed Plaintiff's actions and those of the Defendant Officers. Plaintiff's father declined medical treatment for his son." This fact is also not based on hearsay because the conversation between Plaintiff's father and Officer Salazar is clearly recorded on Officer Salazar's Video. *See* Salazar Video 34:44-50:28.

Plaintiff next asserts that the Defendant Officers' affidavits are contradicted by several statements made in their reports and interviews taken in connection with this investigation. For example, Officer De Luca stated in his affidavit that while Officer De Luca was attempting to pull over Plaintiff's vehicle, Plaintiff began to make a left turn before the red light turned green. Yet, Officer De Luca failed to relate this detail in his previous Internal Affairs interview. *See* Transcript of IA Interview Resp. Ex. B. Importantly, however, Officer De Luca admitted in his affidavit that his memory was refreshed by reviewing the video footage prior to preparing his affidavit. De Luca Aff. ¶ 5. During the Internal Affairs interview on March 30, 2012, several months after the September 8, 2011 incident, Officer De Luca relayed only those facts that he clearly remembered, and there is no indication Officer De Luca reviewed any video prior to this interview. Moreover, Officer De Luca's omission of a fact in his IA interview does not mean the evidence is unusable. Nor does this omission, and the other omissions outlined by Plaintiff, support the conclusion that Officer De Luca's Affidavit is a "sham affidavit."

Plaintiff cites *Rivera v. Trujillo* as support for his argument to deny or defer summary judgment. In *Rivera*, the plaintiff testified at a deposition that he "blacked out" just prior to the accident in question, which was a material fact. 990 P.2d 219, 222 (N.M. Ct. App. 1999). However, in a subsequent affidavit submitted in opposition to a summary judgment motion, the plaintiff testified he did not "blackout" immediately prior to the accident and that he misunderstood the meaning of the term "blackout" when he testified at his deposition. *Id.* The Court held that the affidavit failed to create a "genuine dispute of fact." *Id.* Noting that the plaintiff admitted in his deposition testimony that the term "blackout" means losing consciousness, the court concluded, "[s]uch post-hoc efforts to nullify unambiguous admissions under oath will not create a factual dispute sufficient to evade summary judgment." *Id.*

The issue here is entirely different. Officer De Luca's affidavit testimony was submitted after he reviewed the videos and refreshed his memory about the events. And his reports and interview were made before this case was filed. During his IA interview, Officer De Luca stated several times that he had an unclear memory of all of the details of that night. More importantly, there is really no direct contradiction between Officer De Luca's accounts, just certain details left out of the IA interview that are included in his subsequent affidavit.

Plaintiff further argues that in the IA interview, Officer De Luca never mentions whether the passenger window was up or down when he initially approached the Impala. However, in his affidavit, Officer De Luca testified that he asked the passenger to roll down the window. Whether the passenger's window was already open or whether Officer De Luca asked the passenger to open the window is immaterial. Based on the burnt marijuana smell coming from inside the Impala, both Sergeant Strahon and Officer De Luca had sufficient reason to investigate the presence of marijuana and whether the driver was intoxicated.

Next, Plaintiff points out that in the IA interview, Officer De Luca testified that Plaintiff was on the phone with his father when Officer De Luca re-approached him to get consent to search his car, but in his affidavit, Officer De Luca testified that when he approached to get consent for the search, Plaintiff had already spoken with his father. The difference in Officer De Luca's testimony is also not material to the Court's determination. The material fact is that Plaintiff denied the Officer De Luca consent to search the Impala, and that fact is not disputed. To the extent Plaintiff attempts to create a question as to Officer De Luca's credibility, this attempt fails as well. None of the so-called contradictory statements by Officer De Luca undermine the basic material facts on the record.

C.  The Traffic Stop Was Reasonable

1. *Initial Reason for Stop Was Valid Even Though Mistaken*

Plaintiff argues, and Defendants do not dispute, that at the time Officer De Luca pulled Plaintiff over, the Impala's headlights were illuminated, and Plaintiff was not in violation of the Santa Fe Code § 12-10-1.5 or the corresponding state law.[14] Defendants maintain that Officer De Luca had a reasonable belief based on what he observed, that Plaintiff was violating § 12-10-1.5(D) of the Santa Fe Code, which prohibits the use of parking lights as a substitute for headlights at night. Officer De Luca testified that the front lights of Plaintiff's vehicle appeared "dull orange" in color and dimmer than standard headlights causing him to believe "that this vehicle was being driven with its parking lights illuminated, rather than its headlights. . ." De Luca Aff. ¶ 8. This statement is supported by the video evidence which shows that the Impala's lights were duller and dimmer than the bright white lights of other vehicles driving on Cerillos Road that night. De Luca Video 1:20-1:27.

---

[14] Plaintiff correctly cites NMSA § 66-3-802 as the corresponding state statute requiring headlamps on vehicles when there is insufficient light to render clearly discernible persons and vehicles on the highway at a distance of 500 feet.

Plaintiff correctly asserts that Officer De Luca cannot justify a traffic stop based on a mistake of law. For example, the defendant in *United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004) argued that a traffic stop in broad daylight for a violation of Oklahoma's statute on the use of fog lamps was unreasonable because it was based on a mistake of law. *Id.*at 1144-45.  The Tenth Circuit Court of Appeals agreed:

> The videotape of the stop plainly reveals [the stop] occurred during daylight hours when visibility was clear. The only restriction section 12–217D placed on the use of the truck's fog lamps is that such lamps could not be "used in substitution of headlamps" except under conditions of rain or fog. Section 12–201 required the use of headlamps from thirty minutes after sunset to thirty minutes before sunrise. Because Oklahoma law did not require the use of headlamps at the time of the stop, we fail to see how the truck's fog lamps were "used in substitution of headlamps."

*Id.* at 1144. The decisive factor in the *DeGasso* analysis was that Trooper Cason mistakenly pulled over the truck during the daylight hours for a violation of a statute that required headlamps at night and which prohibited fog lamps as a substitute for headlamps. There was clearly no legal basis on which to stop the defendant's vehicle. *Id.*

In this case, however, Officer De Luca was not mistaken about what the law required: the law required headlights at night, and the law prohibited the use of parking lights as a substitute for headlights.  Officer De Luca's mistake was of the fact that Plaintiff's headlights were illuminated and that Plaintiff's parking lights were not being used as a substitute for headlights. Plaintiff asserts that in his IA interview, Officer De Luca stated that Plaintiff's car had only the parking lights on the side engaged.  However, the video clearly shows that the Impala's front lights were engaged. Plaintiff also disputes Officer De Luca's affidavit testimony that Plaintiff's car did not illuminate objects in front of it and points out that Officer De Luca failed to relate this observation in his IA interview. Again, Officer De Luca expressly admits having watched the videos to refresh his recollection prior to preparing his affidavit. The Court can find no statements in Officer De Luca's IA interview that directly contradict Officer De Luca's

perception, recounted in his affidavit, that objects in front of Plaintiff's vehicle were not sufficiently illuminated. Officer De Luca's mistaken belief that Plaintiff was driving with parking lights was a mistake of fact, not a mistake of law. If Plaintiff had been driving with only parking lights, he would have been violating the law. In other words, Officer De Luca was correct in his interpretation of the law. The dispositive question here is whether Officer De Luca's mistaken belief was reasonable under the circumstances, and given the video evidence, the Court finds that it was reasonable.

Officer De Luca's Video shows that Plaintiff's vehicle had front lights on that were a duller and dimmer than the bright white lights of the other cars on the same street. Moreover, as Plaintiff's Impala makes a left turn at the traffic light, Officer De Luca's Video and Sergeant Strahon's Video show that the Impala's front lights did not illuminate the street in front of it as did the lights of the other vehicles on the road that night. *See supra* note 6. Therefore, Officer De Luca's mistaken belief that Plaintiff was driving without headlights and with only parking lights was objectively reasonable, even though mistaken. "Reasonable suspicion may be supported by an 'objectively reasonable' good faith belief even if premised on factual error," and it is irrelevant "that the facts may not support a conclusion that [defendant] actually violated the law. . . ." *United States v. Vercher*, 358 F.3d at 1261, 1263.

2. *Investigative Detention Was Reasonable*

Plaintiff maintains that the Defendant Officers unlawfully expanded the traffic stop after Plaintiff received the traffic citation for driving without headlights. Plaintiff correctly asserts that when a traffic citation is signed, a traffic stop is usually over, and the driver must be allowed to leave. *United States v. Cervine*, 347 F.3d 865, 870 (10th Cir. 2003). However, if a police officer has articulable reasons to suspect that a crime is being committed, the officer may extend the

stop to a reasonable period sufficient to investigate that suspicion. *See, e.g., United States v. Roberts*, 572 F. Supp. 2d 1240, 1249 (D. Kan. 2008) (noting that during a *Terry* stop, detection of the smell of marijuana inside a vehicle is sufficient to extend a stop and provides probable cause to search the passenger compartment of that vehicle). Plaintiff further asserts that New Mexico statutory law requires an officer to release a motorist after the motorist signs the citation. NMSA § 66-8-123 provides:

> . . . unless a penalty assessment or warning notice is given, whenever a person is arrested for any violation of the Motor Vehicle Code or other law relating to motor vehicles punishable as a misdemeanor, the arresting officer, using the uniform traffic citation in paper or electronic form, shall complete the information section and prepare a notice to appear in court, . . . have the arrested person sign the agreement to appear as specified, give a copy of the citation to the arrested person and release the person from custody.

NMSA 1978 § 66-8-123(A). Plaintiff contends this statute creates a liberty interest protected by the Fourteenth Amendment, and after he received the citation for no headlights, Plaintiff should have been immediately released. However, Plaintiff ignores the evidence of additional offenses, possession of marijuana and driving while intoxicated, which the Defendant Officers had a duty to investigate. Thus, the prolonged detention to investigate those additional offenses was reasonable even after Plaintiff received the citation for no headlights.

Plaintiff cites *State v. Bricker*, 2006-NMCA-052, 139 N.M. 513, 520, in which the New Mexico Court of Appeals held that a motorist had been unlawfully arrested for driving on a suspended license, an offense for which a police officer is allowed only to issue a citation under New Mexico law. *Id.* ¶ 14. In *Bricker* a police officer stopped the defendant on suspicion of driving with a suspended license. *Id.* ¶ 3. When the defendant could not produce a driver's license and dispatch reported that defendant's license was suspended, the officer arrested the defendant for driving on a suspended license. *Id.* While doing an inventory of the defendant's possessions during booking, the detention officer found a syringe with methamphetamine in the

defendant's wallet, and the defendant was charged with possession of narcotics and narcotics paraphernalia. *Id.* The district court denied defendant's motion to suppress the drug evidence, but the Court of Appeals reversed holding that the defendant's arrest for a suspended license violated New Mexico statutory law. *Id.* ¶ 5. The relevant statute, NMSA 1978 § 66-8-122, allows an officer to arrest a person for driving with a suspended license, but only if the suspension was due to a conviction for driving while intoxicated. *Id.* ¶ 8. If a motorist is driving with a suspended license for a reason other than DWI, an officer must cite and release the motorist. *Id.* In response to the State's argument that the officer was authorized to arrest defendant under the misdemeanor arrest statute, § 66-8-127, the court ruled, ". . . we do not believe the Legislature intended to give police officers unbridled discretion to either arrest and book a driver or merely cite and release a driver." *Id.* at ¶ 13. In *Bricker,* the drug evidence was excluded because the inventory search of the defendant's wallet was incident to an unlawful arrest under the New Mexico Constitution. *Id.* at ¶¶ 20-21 (noting that the New Mexico Constitution provides broader protection than the Fourth Amendment).

Plaintiff argues that under *Bricker*, his prolonged detention after receiving the citation for no headlights was unreasonable. However, the court in *Bricker* recognized that the Fourth Amendment allows an investigatory detention if supported by reasonable suspicion of a crime, even when the crime is one that requires a citation. *Id.* ¶ 20. Here, the Defendant Officers acted reasonably after smelling marijuana coming from inside the Impala by further detaining Plaintiff and his passengers to investigate whether they were in possession of narcotics or whether Plaintiff had been driving while intoxicated. Thus, the investigative detention after Plaintiff received the citation until the time he was removed from the Impala, was reasonable under the Fourth Amendment.

D.  Arrest Was Supported By Probable Cause

1. *No De Facto Arrest*

Plaintiff asserts that when Sergeant Strahon and Officer De Luca approached the Impala, the stop became a *de facto* arrest because Officer De Luca refused to let Mr. Valencia exit his car to check to see if his headlights were illuminated. In the video recordings and in Plaintiff's affidavit, however, there is no evidence that Plaintiff requested and was denied the opportunity to check his headlights.

A *de facto* arrest occurs when a person being detained feels he has no right to terminate the encounter and go on his way. "An arrest is distinguished" from an investigative *Terry* stop "by the involuntary, 'highly intrusive' nature of the encounter." *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007). For example, an officer's "use of firearms, handcuffs, and other forceful techniques" usually merit the conclusion that a suspect has been arrested. *Id.* at 1115-16. The approach of Sergeant Strahon and Officer De Luca to the Impala during a traffic stop is not sufficiently intrusive to constitute a *de facto* arrest. *Id.* Significantly, the moment the Impala's windows were opened, the officers smelled burnt marijuana and both Sergeant Strahon and Officer De Luca had observed Plaintiff drive into the intersection while the light was still red. Reasonable officers who detected the odor of marijuana and who observed the prior red light infraction would reasonably believe they had cause to expand the investigation from one involving a headlight violation to an investigation into whether Plaintiff was driving while intoxicated or possessing marijuana. Therefore, from the very beginning of the detention, the Defendant Officers had reasonable cause to investigate whether one or more crimes may have been committed. This was a reasonable investigative detention of Plaintiff and his passengers in light of what the Defendant Officers observed, not a *de facto* arrest.

2. *Contradicting Reasons for Arrest*

Clearly, Plaintiff was arrested when he was pulled out of the Impala and placed in handcuffs. Plaintiff argues that the arrest was unreasonable because at the scene, he was told he was arrested only for resisting and obstructing.  However, in their summary judgment brief, Defendant Officers contend that Sergeant Strahon and Officer De Luca suspected Mr. Montano was concealing his identity and that Plaintiff may have been engaging in false imprisonment when Plaintiff rolled up the windows and locked the Impala's doors. Also in their brief, Defendant Officers argue they had probable cause to arrest Plaintiff for possession of marijuana and synthetic marijuana. However, these seemingly contradictory statements are not the deciding factor in determining the legality of the arrest.

An officer is entitled to qualified immunity if "a reasonable officer could have believed that probable cause existed to make an arrest." *Robertson v. Las Animal County Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007). In order to overcome a defense of qualified immunity, a plaintiff must demonstrate that it would be "readily apparent to any reasonable officer" that, under clearly established law, he had no basis to affect an arrest under the circumstances. *Koch v. City of Del City*, 660 F.3d 1228, 1241 (10th Cir. 2011).  Under the New Mexico Juvenile Delinquency Act, a juvenile may be charged with: . . . (1) . . . (a) driving while under the influence of intoxicating liquor or drugs; . . . or (4) a violation of the Controlled Substances Act." NMSA 1978 § 32A-2-3 (A)(1)(a); and (4). In addition, a juvenile may be charged with resisting and obstructing under NMSA 1978 § 30-22-1(D) (defining resisting and obstructing an officer as "resisting or abusing any . . . peace officer in the lawful discharge of his duties."). At the time Plaintiff was arrested, the Defendant Officers had probable cause to suspect Plaintiff or one of his passengers was in possession of illegal narcotics, either marijuana or synthetic marijuana. In

addition, Sergeant Strahon and Officer De Luca had enough information to suspect that Plaintiff could have been driving while intoxicated even though they did not do a field sobriety test or arrest Plaintiff on this charge. Finally, when Plaintiff refused to comply with a lawful order to step out of the vehicle, the Defendant Officers had probable cause to arrest Plaintiff for resisting or obstructing under § 30-22-1(D). *See State v. Wade*, 100 N.M. 152, 667 P.2d 459 (N.M. Ct. App. 1983) ("Under New Mexico law, '[r]esisting, evading, or obstructing an officer primarily consists of physical acts of resistance.'").

From the beginning of this traffic stop, it would have been apparent to any reasonable officer that there was probable cause to investigate marijuana possession or driving while intoxicated.  In connection with the investigation of those offenses, a reasonable officer would be justified in removing Plaintiff from the Impala. When Plaintiff resisted the order to step out of the Impala, a reasonable officer would be justified in arresting Plaintiff for resisting and obstructing a lawful order of an officer. The different reasons given at the scene compared with the subsequent statements and arguments on summary judgment do not change the probable cause analysis in the context of qualified immunity.  Because the investigative detention and subsequent arrest of Plaintiff was reasonable under the Fourth Amendment, the Defendant Officers are entitled to qualified immunity from the Count I claim of unlawful detention and seizure.

### E.  Force Was Not Excessive

In Count II, Plaintiff contends that when Officers Salazar and De Luca physically pulled Plaintiff out of the Impala, they violated his Fourth Amendment right to be free from excessive and unnecessary force. Compl. ¶¶ 57-58. In a qualified immunity analysis, the Court must determine whether Officer De Luca and Officer Salazar used force that was "objectively

reasonable" in light of the circumstances. *Marquez v. City of Albuquerque*, 399 F.3d 1216, 1220 (10th Cir. 2005). A "court assesses the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." *Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1314 (10th Cir. 2002) (quoting *Medina v. Cram,* 252 F.3d 1124, 1131 (10th Cir. 2001)). The analysis of excessive force includes a determination of several factors, including the severity of the alleged crime, the degree of threat that the suspect appeared to pose, and the cooperation or lack thereof, by the suspect. *Thompson v. Salt Lake City*, 584 F.3d 1304, 1313 (10th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 396-97 (1989)).

When Plaintiff began to argue with Sergeant Strahon, who was lawfully asking Mr. Montano to step out of the back seat, Plaintiff interfered with the Defendant Officers' lawful investigation. In response, Sergeant Strahon was justified in ordering Officers De Luca and Salazar to remove Plaintiff from the Impala. *Maryland v. Wilson*, 519 U.S. at 413. Officers De Luca and Salazar moved from the passenger side and told Plaintiff several times to "step out of the car." The evidence shows that the Officers De Luca and Salazar could not get Plaintiff out of the Impala because Plaintiff held on to the steering wheel, braced his legs against the floorboard, and refused to exit the vehicle. During the two minute struggle, Officer Salazar repeatedly instructed Plaintiff to get out of the vehicle while pulling Plaintiff and trying to pry his arms off of the steering wheel. Officer De Luca's use of pressure points and leverage techniques to pull Plaintiff out of his vehicle was reasonable under the standards articulated by the Tenth Circuit.

The reasonable use of force in this case is illustrated by comparing this case to *Mecham v. Frazier*, 500 F.3d 1200, 1204-05 (10th Cir. 2007). In *Mecham*, a driver was pulled over for speeding and for driving without a seat belt. *Id.* at 1202. After learning that the driver's license

was suspended, the officer questioned the driver about whether she had a valid license from another state, a fact the officer learned from dispatch. *Id.* During the questioning, the driver received a cell phone call and refused to continue the conversation with the officer. Fifteen minutes later, a tow truck arrived to impound the vehicle, but the driver refused to exit the vehicle and insisted on staying in the vehicle until her mother arrived. *Id*. Another officer arrived as backup, and that officer told the driver she would be arrested unless she exited the vehicle, but she again refused. *Id.* The officer sprayed her face with pepper spray, opened the driver's door, and physically removed her from the vehicle. *Id.* at 1203. The Tenth Circuit Court of Appeals held that the district court should have granted summary judgment in favor of the officers on the issue of qualified immunity. *Id.* Due to the suspect's resistance to arrest and safety concerns on the shoulder of a busy highway, "the officers['] conduct in this case was reasonable." *Id.* at 1204. "With the benefit of hindsight, one might have hoped for a different resolution. But '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.'" *Id.* (quoting *Graham,* 490 U.S. at 396). In making an arrest, officers may inevitably use some degree of "physical coercion or threat thereof" to affect it. *Id.*

As illustrated by the holding in *Mecham*, the force used here on Plaintiff, while unfortunate, was not excessive, even though the arrest occurred in a parking lot not on a busy highway shoulder. The Defendant Officers had the right to order all occupants out of the Impala, and when Plaintiff physically resisted that order, the Defendant Officers were justified in using this reasonable amount of physical force to pull Plaintiff out of his vehicle. *See also Lawrence v. Kenosha County*, 391 F.3d 837, 843 (7th Cir. 2004) (holding officer entitled to qualified immunity on excessive force claim brought by a driver who refused to produce a driver's license and resisted an order to exit the vehicle where officer grabbed driver's left arm and attempted to

pull driver out of vehicle, and after driver got out of vehicle, officer pulled driver's wrist behind

him causing shoulder injury); and *McGruder v. Heagwood*, 197 F.3d 918, 920 (8th Cir. 1999)

(granting qualified immunity and finding that officers, who forcibly removed a driver from his

vehicle, reasonably believed driver was resisting arrest when driver tried to leave bank parking

lot and remained inside his vehicle after he was stopped). Plaintiff's Count II claim of excessive

force will be dismissed.

    F.  <u>Plaintiff's Retaliatory Arrest Claim Fails</u>

        In Count III, Plaintiff claims he was arrested in retaliation for voicing his objections to

what he felt was unreasonable police conduct. This arrest, argues Plaintiff, violated his First

Amendment rights. Defendants argue that Plaintiff's Count III claim fails as a matter of law

because Plaintiff's arrest was supported by probable cause. To make a First Amendment

retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected

activity; (2) the government's actions caused him injury that would chill a person of ordinary

firmness from continuing to engage in that activity; and (3) the government's actions were

substantially motivated as a response to his constitutionally protected conduct. *Stoncipher v.*

*Valles*, 2014 WL 2937038, * 10. Under the evidence presented, particularly the video recordings,

the Court finds that Plaintiff has failed to show the Defendant Officers were substantially

motivated to arrest Plaintiff as a response to Plaintiff's spoken objections.

        Plaintiff cites *State v. Doe* in support of his argument. 1978-NMSC-072, ¶ 7, 92 N.M.

100, 583 P.2d 464. That case involved an arrest and conviction of a juvenile defendant for

disorderly conduct based on the defendant's argumentative protest of a traffic stop. In response

to a traffic stop in a liquor store parking lot, the defendant loudly demanded to know why the

vehicle, in which he was a passenger, was being detained. *Id.* ¶ 6. The officer testified he arrested

the defendant because he was getting angry. *Id.* ¶ 7. After examining the elements of the crime of disorderly conduct, which requires conduct that "tends to disturb the peace," the New Mexico Supreme Court ruled there was no probable cause for the arrest on the charge of disorderly conduct. "[A]t the time of the arrest the defendant was not "combative," nor was it apparent that his words or actions would produce violence or disturb the peace." *Id.* The court then quoted *Norwell v. City of Cincinnati,* 414 U.S. 14, 16 (1973), "one is not to be punished for nonprovocatively voicing his objection to what he obviously felt was a highly questionable detention by a police officer." *Id.* at ¶ 7.

This case differs significantly. During this lawful traffic stop, Sergeant Strahon was justified in ordering Mr. Montano to step out of the Impala to investigate Mr. Montano's identity as well as to continue the investigation of marijuana possession. When Plaintiff voiced his objection to Mr. Montano's removal, Sergeant Strahon was justified in having Officers De Luca and Salazar remove Plaintiff from the Impala in order to continue the same investigation. Plaintiff's physical resistance to a lawful order to step out of the Impala provided a sufficient reason to arrest Plaintiff for resisting and obstructing. Unlike the officer in *State v. Doe*, the Defendant Officers acted reasonably at every step leading to Plaintiff's removal from the Impala. Thus, there is no evidence that the Defendant Officers retaliated against Plaintiff for voicing his protest of his or his passenger's removal from his vehicle.[15]

Defendant Officers cite *Reichle v. Howards,* 132 S.Ct. 2088 (2012) to support their argument that when an arrest is supported by probable cause, a claim for retaliatory arrest fails as a matter of law. However, the *Reichle* decision is not that broad. In that case, the plaintiff claimed he was arrested for voicing a statement to Vice President Cheney that his policy in Iraq

---

[15] Plaintiff was also not expressing a valid right to remain in his vehicle. Under longstanding Supreme Court precedent, the officers had the right to have all occupants exit the vehicle during an otherwise valid traffic stop. *Maryland v. Wilson*, *supra*.

"was disgusting" and for allegedly touching the Vice President on the shoulder during the short encounter. *Id.* 2091. The plaintiff was arrested for assaulting the Vice President.  After the charges were dropped, the plaintiff brought a *Bivens* action against the Secret Service agents claiming he was arrested without probable cause in violation of the Fourth Amendment. The plaintiff also alleged he was arrested in retaliation for criticizing the Vice President in violation of the First Amendment. *Id.* at 2092. The district court denied qualified immunity on both claims. The Tenth Circuit reversed on the Fourth Amendment claim finding there was probable cause to arrest the plaintiff; however, the Tenth Circuit affirmed the denial of qualified immunity on the First Amendment claim. *Id.* The United States Supreme Court held that the agents were entitled to qualified immunity because at the time of the arrest, it was not clearly established that an agent can be liable for a retaliatory arrest even though the agent otherwise had probable cause to arrest. The Supreme Court noted that the state of the Tenth Circuit's law on retaliatory arrests was placed in question after the Supreme Court's decision in 2006 that a retaliatory prosecution claim fails if probable cause is established. *See Hartman v. Moore,* 547 U.S. 250, 252, 265-66 (2006) (holding that to prove a claim for retaliatory prosecution, a plaintiff must plead and prove an absence of probable cause.)  The Supreme Court in *Reichle* recognized that its decision in *Hartman* may have confused law enforcement officers as to the law in this area. *Id.* at 2095. "Although the facts of *Hartman* involved only a retaliatory prosecution, reasonable officers could have questioned whether the rule of *Hartman* also applied to arrests." *Id.* The Supreme Court specified that "the right in question is *not* the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause." *Id.* The Supreme Court noted that it "has never held that there is such a right." *Id.*at 2094.  Accordingly, the Supreme Court held that the defendant officers were

entitled to qualified immunity under the "clearly established" prong of the qualified immunity

test. The Supreme Court determined that the agents in *Reichle* should have been granted

qualified immunity because at the time of that arrest, the law was not clearly established that

when an officer has probable cause, he can still be liable for retaliatory arrest if the other

elements of retaliation are proven. *Id.* at 2097.

Defendants interpret the holding in *Reichle* too broadly when they argue that the case

stands for the proposition that probable cause trumps a retaliatory arrest claim. In this case, the

retaliatory arrest claim fails on the merits. Here, there is simply no evidence to support a claim

that the Defendant Officers arrested Plaintiff in retaliation for his protest of their actions.  Hence,

the Court will grant summary judgment on Plaintiff's Count III claim.

G.  State Tort Claims

1. *Intentional Torts*

In Count IV, Plaintiff asserts several claims under state law for assault, battery, false

arrest, and false imprisonment. Under the New Mexico Tort Claims Act (NMTCA),

governmental entities and public employees can be liable only "within the limitations of the Tort

Claims Act and in accordance with the principles established in that act." NMSA 1978 § 41-4-

2(A). The NMTCA allows claimants to sue law enforcement officers and governmental law

enforcement agencies:

> The immunity granted pursuant to Subsection A of Section 41-4-4 NMSA 1978 [granting
> immunity from liability for torts committed within the scope of duty] does not apply to
> liability for personal injury, bodily injury, wrongful death or property damage resulting from
> *assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process,. . .*
> *or deprivation of any rights, privileges or immunities secured by the constitution and laws of*
> *the United States or New Mexico* when *caused by* law enforcement officers while acting
> within the scope of their duties.

NMSA 1978, § 41-4-12 (1976) (emphasis added). Thus, an officer can be held liable for most intentional torts committed while in the course and scope of the officer's duties. *Id.*

Defendants assert that since Plaintiff cannot show the Defendant Officers violated Plaintiff's Fourth Amendment rights, Plaintiff's New Mexico tort claims also fail. The courts in New Mexico agree with this assertion, "Plaintiff's claims for false imprisonment, false arrest, and malicious prosecution presuppose that [the officer] did not have probable cause to arrest Plaintiff. . . ." *Dickson v. City of Clovis*, 2010-NMCA-058, ¶ 21, 148 N.M. 831, 242 P.2d 398. Under New Mexico law, a law enforcement officer commits assault and battery during an arrest only if the officer has no justification for the arrest or uses excessive force. *Sisneros v. Fisher*, 685 F. Supp. 2d 1188, 1220-21 (D. N.M. 2010) (applying New Mexico law). Since Defendant Officers were justified in arresting Plaintiff, and since Defendant Officers did not use excessive force, their actions do not constitute false imprisonment, false arrest, assault, or battery under New Mexico law.

Plaintiff argues that his state law claims survive because the New Mexico Constitution Art. II § 10 provides greater protection then the Fourth Amendment. However, nowhere in the Complaint does Plaintiff allege a claim that Defendant Officers violated his rights under the New Mexico Constitution. But, even if Plaintiff had made that allegation, Defendant Officers had sufficient cause to investigate and to arrest Plaintiff under state law. *State v. Goss*, 111 N.M. 530, 534, 807 P.2d 228, 232 (Ct. App. 1991) ("It is settled law that detection of the odor of marijuana by law enforcement officers may provide probable cause for detention of an individual and constitute a valid basis for further investigation."). Hence, Defendant Officers, by detaining Plaintiff to investigate the possibility of marijuana possession, did not violate the New Mexico Constitution. Moreover, under New Mexico law, Plaintiff's open, physical resistance to Officer

Salazar's order to exit the vehicle provided probable cause to arrest for resisting a lawful order

by a law enforcement officer. *Keylon v. City of Albuquerque*, 535 F.3d 1210 (10th Cir. 2010)

(noting that resisting, evading, or obstructing an officer primarily consists of "physical acts of

resistance."). Therefore, the Court will dismiss Plaintiff's Count IV claims under New Mexico

tort law.

2. <em>Violation of the New Mexico Children's Code</em>

In Count V, Plaintiff alleges that Defendants violated the New Mexico Children's Code

through illegally detaining Plaintiff, a juvenile. The New Mexico Children's Code states:

> A. Unless ordered by the court pursuant to the provisions of the Delinquency Act, a child
> taken into custody for an alleged delinquent act shall not be placed in detention unless a
> detention risk assessment instrument is completed and a determination is made that the
> child:
> (1) poses a substantial risk of harm to himself;
> (2) poses a substantial risk of harm to others; or
> (3) has demonstrated that he may leave the jurisdiction of the court.

NMSA 1978 § 32A-2-11 (A). As the plain language of this statute illustrates, once a juvenile is

taken into custody for an alleged delinquent act, he cannot be placed in a detention center

without a detention risk assessment. In this case, Plaintiff's detention and eventual arrest were

supported by reasonable suspicion and probable cause based on the smell of marijuana inside the

Impala. The evidence shows that Defendant Officers followed the letter of this law. Officer De

Luca was instructed to forward the charges to the Juvenile Probation Department. Officer De

Luca called juvenile probation, and was advised that the risk assessment for Plaintiff showed that

he should not be incarcerated. Plaintiff was not incarcerated, but was released to his father.

Count V, therefore, fails as a matter of law.

### 3.  *Malicious Prosecution*

Count VI makes an additional state law claim for malicious prosecution against Officer

De Luca. Although Plaintiff refers to his state claim as one for malicious prosecution, the claim

will be construed as one for malicious abuse of process. *See DeVaney v. Thriftway Mktg. Corp.,*

1998–NMSC–001, ¶ 12, 124 N.M. 512, 953 P.2d 277 (merging the torts of abuse of process and

malicious prosecution to create the new tort of malicious abuse of process), overruled on other

grounds by *Durham v. Guest,* 2009–NMSC–007, 145 N.M. 694, 204 P.3d 19. Under New

Mexico law, a malicious abuse of process occurs under the following circumstances:

> (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the
> original action terminated in favor of the plaintiff; (3) no probable cause supports the
> original arrest, continued confinement, or prosecution; (4) the defendant acted with
> malice; and (5) the plaintiff sustained damages.

*Wilkins v. Reyes*, 528 F.3d 790, 799 (10th Cir. 2008).  As the Court has already found, Plaintiff's

detention and eventual arrest were supported by probable cause; therefore, the third element of

this claim cannot be established as a matter of law. The Court will dismiss Count VI.

### 4.  *Municipal Liability Claims*

Count VII alleges that the City is liable under New Mexico law for negligent hiring,

training, and retention of Defendant Officers.[16] The City maintains that Plaintiff has failed to

identify any acts of negligence in the hiring, training, and retention of Defendant Officers. In

addition, the City correctly asserts that municipal liability cannot exist without the commission

---

[16] In the Response, Plaintiff argues that he has presented sufficient evidence to go forward with his claim of liability against the City under § 1983. However, the Complaint does not assert a § 1983 claim against the City, but merely alleges negligence claims. *See* Compl. ¶¶ 91-95. However, even if Plaintiff did assert a § 1983 claim against the City, Plaintiff was required to show that the City participated in the illegal behavior of its officers by maintaining a formal policy or a practice or custom, even though not formal, that violated Plaintiff's constitutional rights. This Plaintiff has failed to show. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

of an underlying tort. Since Defendant Officers did not commit any underlying tort, Plaintiff's

claim may not stand. Under New Mexico law, municipalities and police departments may be

liable for negligent hiring, training, and supervision of law enforcement employees only if those

employees commit one of the enumerated torts in § 41-4-12. *State v. Ortiz*, 112 N.M. 249, 250,

814 P.2d 117, 118 (1991). Since Plaintiff has failed to show that the Defendant Officers

committed one of the torts for which immunity is waived under New Mexico law, Plaintiff's

claim of negligent hiring, training, and supervision must be dismissed.

Count VIII asserts that the City is liable for Defendant Officers' illegal actions under the

doctrine of respondeat superior. Under the New Mexico Tort Claims Act, "[a] governmental

entity is not immune from liability for any tort of its employee acting within the scope of duties

for which immunity is waived." *Silva v. State*, 106 N.M. 472, 477, 745 P.2d 380, 385 (1987).

The New Mexico Supreme Court held in *Silva* that the doctrine of respondeat superior extends

liability to the public entities that have supervisory control over the tortious actors. *Id.* Since

Defendant Officers were acting within the scope of their authority, the City may be held

vicariously liable for any alleged torts committed by the officers for which immunity has been

waived. However, as the Court has concluded, Plaintiff has failed to present evidence that

Defendant Officers committed any of the torts listed in the NMTCA; therefore, the claims

against the City under the doctrine of respondeat superior must be dismissed.

Under the facts presented by admissible evidence, particularly in the videos, Plaintiff has

failed to show that the Defendant Officers violated his clearly established federal constitutional

rights. In addition, Plaintiff's state law claims fail as a matter of law under the evidence of

record. Therefore, the Court will grant the Motion and will dismiss all counts of the Complaint.

IT IS ORDERED that DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE BASIS OF QUALIFIED IMMUNITY (Doc. No. 31) is granted. The Court will enter a separate summary judgment in favor of Defendants.

_____

SENIOR UNITED STATES DISTRICT JUDGE